John Tangerine v. Plaintiffs Economic Loss Claims Against Ford for its Failure to Disclose a Deadly Unintended Acceleration Defect in Their Vehicles District Court Erred First by Treating These Claims as if They Were Personal Injury Claims. The Court Also Failed to Analyze Plaintiffs' Claims State-by-State, as Illustrated by the Recent GM Ignition Decision and Other Automotive Defect Cases. In Doing So, It Applied the Incorrect Law in an Inappropriate, Across-the-Board Manner. Can I ask you, did you argue to the District Court that the law on manifestation varied among the 17 states that are at issue here? We did, Your Honor. Admittedly, not as much at the motion-to-dismiss stage as on summary judgment. But on summary judgment, we had 100 pages worth of briefing on most of the states that are at issue here. On the law on manifestation under the warranty and unjust enrichment theories? Correct, Your Honor. Okay. Thank you, Your Honor. Second, the District Court also Erred by Excluding the Reliable Testing by Three of Plaintiffs' Experts Demonstrating How Unintended Acceleration Can Occur Under Real-World Conditions. In an overcorrection to this Court's decision in Mies v. Ford Motor Company, which also involved unintended acceleration in a Ford vehicle, the District Court failed to recognize that Plaintiffs' Experts Satisfied Daubert with Flying Colors. Plaintiffs' opinions have been tested, peer-reviewed, and are generally accepted within the relevant automotive engineering community. The District Court instead made several clearly erroneous findings of fact and applied an overly strict standard that no expert hoped to satisfy. The District Court's third error was in ignoring Plaintiffs' evidence of the ETC system defect apart from the evidence of the three experts, including a safer design alternative that Ford was already using in its European vehicles, and Ford's own internal studies tying adoption of the ETC system to increased rates of unintended acceleration. If we were to conclude that the District Court was correct and that they properly excluded the experts, and so essentially you had no evidence, then we wouldn't get to the initial issues, would we? I mean, if there's no defect, your case is over. If there's no defect, well, that's precisely the issue that we're raising on the field, is that we put forward evidence that Ford had essentially admitted internally that there was a defect, despite not needing to have three experts pointed out in litigation down the road. We had evidence from a fourth expert, Dr. Loudon, that the District Court did not exclude, who also found that there was a defect in the software. The District Court entirely failed to mention or acknowledge that that evidence was out there and also supported our evidence of defect. Similarly, there was evidence of a safer design alternative that is now industry standard when an ETC system is installed in a vehicle to have what is known as a brake override system that allows the driver, if unintended acceleration were to begin to occur, to immediately put a stop to it by pressing down on the brake. So it looks like to me that you had three experts that had a hypothesis that said it's feasible to conceive of a situation where the throttle may take off on its own, but they didn't have a whole lot more than a hypothesis. So one thing that just struck me as very odd about this case was that you were bringing it, or hoped to bring it, as a class action case. You've got this class that you talk about from time to time that has X number of million vehicles in it, but yet none of the experts tested either even one of these millions of vehicles to try to fit their hypothesis into an actual event, which I just found that to be bizarre. Judge Agee, I think that the premise of your question actually shows a flawed understanding of the record that the district court had also applied here. Hubing's testing, for example, laid out in his report on what is page J87467. These are not simply hypothetical faults that I'm injecting into the car that may cause it to result in unintended acceleration. Well, answer that to me. Why, out of all these millions of vehicles, you couldn't find one that you could test to prove that your theory was correct? Well, Hubing tested two vehicles himself, a 2005 Mustang and a 2006 Explorer. Dr. Koven tested four vehicles in his own testing apparatus. Dr. Hubing ran further testing in the five studies that plaintiffs had provided to Ford and that the district court arbitrarily excluded, not because he found them unreliable under Daubert, but simply because he erroneously believed that Ford did not have notice of them. And further, Your Honor, to the extent that the district court faulted plaintiff's experts for failing to test plaintiff's own vehicles, that testing would both have not proven anything that wasn't already in disputed, which is that plaintiff's vehicles share the same ETC system that test vehicles do and would have responded the same way to that testing. But to the extent that the district court required plaintiff's experts to show that the precise defect that they had found caused the unintended acceleration that those plaintiffs had personally experienced. But I didn't understand that you were saying that there was, or that the experts were testifying that there was a defect, but that there was a vulnerability that made the ETC more fault tolerant. In other words, it wasn't so much a design flaw causing UA, it's that a design flaw rendered ETC unable to prevent the manifestation of UA. Necessarily leading to an increased occurrence, which is why I found the suggestion that there are safer alternatives a bit unhelpful, since the fact that there are safer alternatives doesn't necessarily mean that the first alternative is defective. It's a little of both, Your Honor. Dr. Hubing's report again walks through at pages 7468 and 7469. A number of ways in which Ford's ETC system has been designed differently than any other car on the road that makes it much, much easier for unintended acceleration to develop. The fact that it uses three tracks instead of two, except that one of those three tracks is ignored, so it essentially is a less safe version of the two-track system than all of the other two-track systems that are out there. But that's a conclusion, that was what, I'm sorry, go ahead. Oh, but then hopefully I'm responding to the second part of your question. There is also the aspect of, it is impossible to design a system, especially one as complex, that never, ever misbehaves, but there are ways that engineers can account for that as well by installing fail-safes in the vehicles, and in Ford, the biggest one being the brake override system. But in our summary judgment brief, we identified a number of others, that Ford simply failed to install a system that could have been done very easily, simply because Ford didn't want to rely on others' technology, want to save money by developing its own in-house. But these are, I find, somewhat unhelpful labels. Ford utilizes three-sensor system. This is a fascinating record if you don't have an engineering degree. So this three-sensor system creates the acceleration signal when two of the three pedals, pedal sensors produce aligned values within a certain range. That's correct. So your characterization, you're assigning, you're labeling this as de facto good or bad, based on outcomes that haven't necessarily been determined. It's your characterization of it. Well, let me see if I can help you out, Your Honor. That'd be great. The three-track, why it really matters for purposes of this case, and this is one of the most clearly erroneous findings of fact that this report made, is that when Hubing looked at the three-track system, what he realized was that because of the system's ability to simply ignore one of those tracks, it doesn't require multiple simultaneous faults to misbehave. If you could have one of the three just experience a fault and then be unreliable. I thought his testing protocol was designed with the two-sensor assembly. No, he was able to feed inputs onto all three tracks. And then what he did, and what he was able to show using that testing, was that if you have a fault affect one sensor, it could then misbehave for years without the car ever alerting the driver or technician because it doesn't generate a fault code. And then a second fault would come along years later removed in time. That would then cause unintended acceleration. So what the district court failed to understand, and what the district court misused NASA's study, which was the study that was not even in the record, but which Ford relied on heavily for argument to try to refute Hubing, was NASA's finding that simultaneous faults are too improbable to worry about in anything more than a conceptual possibility. In fact, the Ford system were not worried about simultaneous faults, but faults that can occur at any point in time in relation to each other. So what evidence specifically connects the problem that you identify with the ETC to the actual instances of unintended acceleration? Well, I think, again, if you look at Hubing's report, he specifically links the kinds of faults that have been documented in the real world by Ford documents and other studies with the kinds of faults that he injected into the system in order to reproduce unintended acceleration at JA7467. And then if Hubing later concluded in his study that the defects that he uncovered were not only the most likely explanation for the high reported rates of UA in these vehicles, they are the only explanation that is supported by the evidence. And again, this is one of the major failings of the district court's Galbraith analysis as it seemed to have been motivated by its prejudged conclusion that when you have vehicles driven millions of miles with no publicly reported problem of unintended acceleration, then there must simply be nothing wrong. When in fact, Ford's high reported rates of unintended acceleration were even more than Toyota, which was, as the court is well aware, subject to extensive litigation and ultimately an over a billion dollar settlement, a large component of which was the same injunctive relief, the installation of a brake override device that we also allege was wanting here. And then the district court's erroneous findings of fact didn't stop with Hubing. The district court also failed to consider that when Koven was doing his testing, he was not simply injecting inputs that were designed to signal to the automobile that the accelerator pedal was being compressed, but also was conducting testing that gave inputs to the automotive computer that were consistent with the pedal being idle and yet produced unintended acceleration. The district court also failed to recognize that Dr. Koven had been recognized by his peers as someone who had played a outstanding service in the public interest for uncovering the software defects and publicizing and successfully testifying about his actions. Now I reserve the rest of my time for rebuttal. Good morning, Your Honors. May it please the court. John Hacker for Ford. I'd like to start, if I may, where Judge Agee started with two questions that I think answer this case. The first point is that if there is no defect and no expert testimony establishing a defect, there's no case. You don't have to get any other issues. And the second point is that the two defect experts stated a hypothesis, but yes, Judge Agee, they didn't test the hypothesis. There was testing, counsel adverts to some testing of vehicles or actually just assemblies within vehicles on a desktop. So there's testing of vehicle parts, but they never tested the hypothesis. What is the hypothesis? The hypothesis, as Judge Duncan got to, is that you can have simultaneous faults. Two of the three sensors have to be aligned in the correct, very narrow ranges, which are offset in order for the vehicle to accelerate. Their hypothesis was that two of those sensors in offset ranges can simultaneously fault at the same time and send an acceleration signal when the driver is not sending that signal. There is no testing whatsoever, not one test of one vehicle or vehicle assembly that shows ever anywhere that that's occurred, that a fault, an external fault, has sent an electronic signal to two sensors in different ranges and had them land on that same narrow range at the same time, thereby triggering the unintended acceleration. The Postal Council cited one of the two experts. I can't remember which one who actually had two vehicles, two Ford vehicles. What's your take on that? And so that's what I was getting to in saying that the experts tested vehicles are really vehicle parts. The Hubing one, I think, is the one he was referring to initially, the 2015 study, which did include Ford vehicles. There's much to say about that study. First of all, it's what the study itself says. So you'll find on JA3772, this paper does not attempt to identify the root causes of unintended acceleration. That's point one. And then it goes on to say, it's not even going to draw any conclusions about the differences between the vehicles that are being examined. It's difficult to say, this is at 3781, it's difficult to say to what extent, if any, these design differences contributed to the rate of consumer complaints. Literally no conclusions drawn in the study. How much additional study then did this expert do to draw a conclusion that the Ford vehicle is defective? How many tests were run between this study and his opinion? Zero. No additional testing of any Ford vehicles to show that those hypotheses that were drawn in the study, which is that the setup, the two-sensor, three-sensor setup, could lead to this kind of fault. If it turned out ever to be true that a tin whisker, that a corroded sensor, that a saltwater could send in a signal to one sensor, and then an additional signal would somehow be sent by that fault or that trigger or something else, where the two sensors would just happen, in an extraordinary coincidence, to land on the incredibly narrow ranges that are required to send an acceleration signal. That was the hypothesis that Hubing established in the 2015 paper. That could happen. He never proved that it could, never showed that it could. Koopman didn't either. What the two of them showed is that if and when you inject electronic signals into the sensors that come to the ranges, if you get signals that tell two sensors the car is supposed to be accelerating, what happens? They discovered that the car will accelerate because that's how the system is designed. Now whether or not they, you know, because they knew it would lead to that conclusion, that doesn't matter. The point is that their tests, both tests, and the judge found this. Remember, we're talking an abusive discretion standard. The judge read their analysis carefully and correctly concluded that all they effectively did was show that when you inject, or whatever stimuli, inject voltages that instruct two of the sensors, that put the two of the sensors in the required range, narrow ranges for acceleration, you get acceleration. That's all they showed. The analytical gap, to use Joyner's phrase, is that they didn't show that any of these external stimuli, the corrosion, the tin whiskers, the salt water, could ever create a simultaneous fault in the two offset sensors that they ever have, ever would, or ever could. Can I ask a question? Hypothetically, if it were the case that there's not sufficient evidence here to go to a jury on this particular hypothesis, the dual sensor failure, failure to catch the simultaneous dual sensor fault, is that the end of the case? Was it at this point plaintiff's obligation to prove up or provide sufficient evidence to get to a jury on that particular hypothesis, or could you still, at this point, go to a jury, forget that, but look, we've got the statistically significant uptick in the reports after they do this new ETC. We'll go to the jury with that. Forget our first theory. We're going to do something else. So in some other case, that kind of approach might be theoretically possible. It's not possible here, given what they did, the other evidence they did point to, and you heard counsel this morning mention two of those. So you do have to go on and look at the other evidence, but your view is that the other evidence also is not enough to get to a jury. The lower court went on and looked at it. It did. Absolutely, and said it wasn't sufficient, and there's certainly no abuse of, well, that would be a summary judgment question, and there's no error there. What do they point to? They point to, first of all, the most extraordinary thing, and we heard again from counsel this morning, is the mysterious Steve Loudon testimony. It literally doesn't exist. You didn't hear any citations of the record today. They didn't put it in below. They didn't put it in this, in the joint appendix. There's no testimony from Steve Loudon. It's not there. It doesn't exist. So that can't possibly be a basis to get to a jury. They point to the four documents. All the four documents that they point to say is there's sort of two categories of reports that Ford has. There are reports from their own dealer technicians, and then reports from consumers that talk about, allege, what their own expert calls potential unintended acceleration events. Nobody knows as to any one event what really happened, and certainly, and this is the dispositive point, not one of those documents, not one of those reports, says that two sensors faulted in the way that the plaintiff experts hypothesized they may fault at the same time. There are, their own experts say, both Bilek and Gill say, correctly, that there are a wide variety of potential causes of unintended acceleration, the most prominent being driver error, but there's also mechanical faults. There can be transmission errors. All kinds of things can cause unintended acceleration, so it's incumbent on them to show that, in this situation where they can't show a defect, that these reports, that this thing happened, were caused by, they can't show a defect through the expert, it's incumbent upon them to show that these documents that talk about the existence of unintended acceleration actually show that they were caused by the defect their experts can't show, and not by the myriad other causes. And recall that, their own expert himself even calls them potential unintended acceleration events. How many are there, by the way? There's 334 out of 22.4 million vehicles during part of the class period. That's 2002 to 2009, that's an additional year. But even taking that number, what you have is an incident rate of, and I have to do this by my fingers, .00004%, I have to use my hand to get the number of zeros right. That's what their own expert is talking about without even having demonstrated that the potential events were caused by the defect that they're talking about. Let me ask you this separately, the district court recited, or cited to a NASA and another agency study as a critique of the methodology used by either Dr. Hubing or Dr. Kuhlman or both, and opposing counsel has argued that that study should not have been given credence because it predated some other work or that it wasn't in the record. What's your response to that argument? So, a couple of points. I think that, well, the first, the most important point is that the reference to that study was completely supplementary of what the court had already said, which is their experts haven't and cannot, or certainly haven't even tried to show that this simultaneous dual offset fault can ever happen in the real world. None of their testing shows it. He's already established that, and they're not going to dispute it. They're not going to stand up here in their rebuttal and show you we're in the record. Their experts show that that kind of thing happens. So, the court says that. And then he says, there's also a NHTSA and NASA study which observes that that kind of thing doesn't happen in the real world. That's all that he referred to that study for. So, you could excise that part if you wanted to, and there still is a complete absence of proof, a complete analytical gap in their own expert's testimony. So, is there any reference in the record to, other than in the district court's opinion, to, is part of the study placed in the record? Is it referenced? How did it get into the case? Yeah, and that was my second point. And I don't want to be overly defensive about it. I think the court was not wrong to rely on it or to mention it for the unexceptionable observation that it makes because it was used at Huming's deposition. They had full notice that it was used at Huming's deposition. It was raised at oral argument, discussed at the hearing without objection from the plaintiffs at the hearing. So, at that point, it was permissible for the court to refer to it. But I think the completely dispositive point is that all it does is confirm what the court had already correctly held, which they can't and won't deny, that their experts didn't fill the gap that their hypothesis, the gap between their hypothesis and the conclusions. I'd like to make a point, if I can, about the BOA, the brake over accelerator, which is not a separate defect. I think Judge Duncan had that exactly right, or at least the question suggested the correct answer, which is you can't point to the absence of this BOA as a fail-safe until you establish initially that something like that is required because the ETC is susceptible to failure because it's common enough that these two sensors, offset sensors, will simultaneously fall from saltwater or corrosion or tin whiskers or whatever. If you establish that, then you get to the question of, well, what could you have done to mitigate that? And, you know, one could debate about whether a BOA would be sufficient for that. But you never get to that until you establish the defect, which they can't do. I would also add, by the way, if you did get to this question about the BOA, the sufficiency, and this also confirms that it's not an alleged defect here, none of their experts, zero, demonstrated that braking wouldn't work to mitigate this defect. The braking was insufficient when these, the alleged defect, when the alleged defect occurred. In fact, Koopman's tests showed that braking worked. When he did it, he showed that braking worked. That's a JA 1656 to 57. So we would submit that the BOA, which is categorically irrelevant, and to the extent one even thinks about it at all, there's just no evidence that they submitted that, no expert evidence, establishing that the brake isn't sufficient already to mitigate whatever might be caused by the ETC. I think I've addressed this positive question. I'm happy to take questions or discuss the manifestation of defect issue, but I don't know that that's relevant for the court or necessary for the court to get into. Thank you, Your Honors. Thank you. Since the court seems most interested in the question of defects and what plaintiffs' experts said to establish that, I'll take the remaining time to address that unless there are questions on the other issues. The lesson that the district court took away from these, which is obvious from the way that it approached this case, was that it should have paid more credence to Ford's criticisms of the experts, but instead it overcorrected and applied a deferential standard that adopted Ford's criticisms at face value without doing the independent analysis that the offer requires. For instance, the district court seems to have imposed a standard for what plaintiffs' experts needed to do for its testing that is both impractical and at odds with what actually is done in the automotive engineering community. It seems to have thought that plaintiffs would have needed to drive around in their vehicles to replicate on real-world road surfaces an acceleration event. But if one simply waited around for random faults to occur, even at the rate of one incident per one million miles, which Hubing reported on page 4340 of the Joint Appendix, is grossly out of line with what is acceptable for vehicle design. How would you compare the district court's daubered analysis here to what happened in the Lipitor case to which we gave a fair amount of deference to the district court? In the Lipitor case, the district court did a thorough and comprehensive job in analyzing the expert opinions in front of it, whereas here the district court ignored, disregarded, arbitrarily excluded a number of evidence. For example, the district court ignored the fact that in the Toyota case this exact same argument that Dr. Koopman had not replicated an intended acceleration in the real world was simply impractical. What the Toyota court wrote was that NS experts cannot be faulted for failing to test the untestable whether due to the impossibility of replicating a specific arbitrary failure or due to a massive number of commutations of possible failures. In other words, the district court not only required plaintiff's experts to point out the holes in the safety net, but also wanted to watch trapeze artists perform over it until one of them fell through the hole. That's simply not practical. What the district court failed to note is that plaintiff's experts did do this industry standard fault injection testing that Ford's own engineers do. Cubing repeatedly demonstrated unintended acceleration in his testing in his paper found at Joint Appendix 3771-82 and his other studies at Joint Appendix 3897-4050. And similarly, Koopman submitted his own testing report with 50 pages worth of testing results at JA 9920-72. These tests establish that when one injects faults that are found in the real world, unintended acceleration can result from Ford's defective ETC design. The district court's exclusion of Dr. Koopman, as I mentioned briefly on opening, relied on a representation that counsel for Ford made at oral argument. At JA 4247, the district court wrote that during oral argument, counsel for Ford claimed that Dr. Koopman's testing used voltage input that he knew were designed by Ford to instruct the system to accelerate. And that was simply false. And if the district court had done its own read of Koopman's report, what it would have realized was that Koopman used, in many instances, the same testing structures that Ford itself had used. JA 9930, for instance, is a test where Koopman induced unintended vehicle acceleration when the driver was not pressing the pedal. However, the district court found, after complaining that Dr. Koopman's deposition testimony was, quote, confusing and disjointed, that it would simply agree with Ford's characterization of Koopman's testing without doing the work itself to determine whether or not that characterization was correct. And I also want to address a couple of other points on the other evidence of defects. Mr. Lawton's testimony was unavailable for plaintiff's summary judgment opposition because of the strictures that were put in place by a source code protective order that Ford had insisted be put in place before it would allow plaintiffs to... So is there any evidence from him that's in the record? There's nothing that was placed in the record at summary judgment. So we can't consider that. Well, what we can do is reverse the district court for failing. The district court was aware of this evidence. We did mention it in the summary judgment brief. And just because plaintiffs were unable to provide that at summary judgment due to a source code protective order that the court later found was procured by Ford's misrepresentations, causing the court to pay... Well, if there's evidence that isn't in the record, how can you possibly rely on it? What the court can do is determine that the district court's failure to even ask itself, is there other evidence out there? The district court to call it... Well, it's got to be in the record. What the district... I mean, it's not the district court's job to go out and hunt up evidence in a case. I mean, it's your job to put the evidence in the record. And if you say it was wrongfully excluded, then you should raise that as a point of error. Well, we raise as a point of error the district court's failure to consider whether there was any evidence, including this evidence that it was aware of. And in addition to that, the thousands of reports of unintended acceleration that plaintiffs had gathered and put forward in Dr. Madigan and Mr. Billick's expert reports, and Ford's own internal documents, including the studies that are discussed at Joint Appendix 8015 and 8016 of the record, showing a statistically significant increase in unintended acceleration following introduction of the ETC system. And then finally, on Ford's point about the brake override system, plaintiffs have put in a number of reported incidents of unintended acceleration, including the testimony of Trooper Loring that can be found at Joint Appendix 5205, that unintended acceleration was occurring even despite the fact that the brake was being pushed with both feet with all the force of the driver. For all those reasons, we respectfully submit that this report's links should be reversed below. Thank you. Thank you.
judges: Allyson K. Duncan, G. Steven Agee, Pamela A. Harris